## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LINDA P. FARAHANI,

                                CASE NO. 2:21-cv-11125

        *Plaintiff*,             DISTRICT JUDGE DENISE PAGE HOOD

*v.*                        MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 15)

## I.    RECOMMENDATION

       Considering the entire record in this case, I suggest that substantial evidence does not support the Commissioner of Social Security's determination that Plaintiff, Linda Farahani, is not disabled. Accordingly, I recommend that the Court **GRANT** Plaintiff's motion for summary judgment, (ECF No. 13), **DENY** the Commissioner's motion, (ECF No. 15), and remand the case under sentence four of Section 405(g).

## II.    REPORT

### A.    Introduction and Procedural History

       Plaintiff applied for disability insurance benefits ("DIB") on January 24, 2018, alleging that she became disabled on December 31, 2017. (ECF No. 10, PageID.127, 214–20). The Social Security Administration denied her DIB claim on May 8, 2018. (*Id.* at PageID.136–37). Plaintiff requested a hearing before an ALJ which was held on January 22, 2020. (*Id.* at PageID.62, 153). The ALJ issued a decision on April 8, 2020, finding

that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id.* at PageID.44).  The Appeals Council denied review on March 23, 2021. (*Id*. at PageID.34).

Plaintiff subsequently filed a complaint seeking judicial review of the ALJ's final decision on May 17, 2021.  (ECF No. 1).  This case was referred to the undersigned the next day, and both parties later filed cross-motions for summary judgment.  (ECF Nos. 2, 13, 15).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your

3

> residual functional capacity and your age, education, and work
> experience to see if you can make an adjustment to other work.
> If you can make an adjustment to other work, we will find that
> you are not disabled.  If you cannot make an adjustment to other
> work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534

(6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by [his or] her impairments and the fact that [he or] she

is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc.

Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing

the residual functional capacity, which "is the most [the claimant] can still do despite [his

or her] limitations," and is measured using "all the relevant evidence in [the] case record."

20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step

without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*, 459

F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that

"other jobs in significant numbers exist in the national economy that [the claimant] could

perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486

F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was

not disabled.  (ECF No. 10, PageID.57).  At step one, the ALJ found that Plaintiff had not

engaged in substantial gainful activity since December 31, 2017, the alleged onset of

disability date.  (*Id.* at PageID.49).  At step two, the ALJ concluded that Plaintiff had the

4

following severe impairments: degenerative disc disease and disc bulges of the lumbar spine, sacroiliitis, and trochanteric bursitis of the bilateral hips. (*Id.* at PageID.50). The ALJ found that Plaintiff's acute gastroenteritis, acute upper respiratory infection, and acute bacterial skin infection were either nonsevere or not medically determinable. (*Id.* at PageID.50–51). At step three, the ALJ decided that none of Plaintiff's severe impairments met or medically equaled a listed impairment. (*Id.* at PageID.51). Next, the ALJ determined that Plaintiff had a residual functioning capacity to perform light work,[1] except that Plaintiff was "limited to occasional crouching, crawling, kneeling, stooping/bending, and climbing of stairs and ladders." (ECF No. 10, PageID.51–56). At step four, the ALJ found that Plaintiff could perform her past relevant works as a casino dealer. (*Id.* at PageID.56).

### E. Background

#### 1. Medical Opinions

In 2018, Plaintiff underwent physical therapy for her hips and lumbar spine with an athletic trainer for approximately two months. (*Id.* at PageID.54, 458). A year later, Plaintiff returned to her athletic trainer, Mr. Misiewicz, for an evaluation of her functional abilities. (*Id.* at PageID.449, 458). Mr. Misiewicz performed numerous tests on various functional abilities such as Plaintiff's grip and fine motor skills, her ability to bend, and her

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2021).

ability to balance.  (*Id.* at PageID.452–57).  After each test, Mr. Misiewicz noted Plaintiff's objective performance, her change in heat rate, and her self-reported pain level.  (*Id.*)

For example, Mr. Misiewicz tested Plaintiff's ability to climb and descend thirty-six stairs.  (*Id.* at PageID.456).  He noted that Plaintiff completed the test in ninety-eight seconds, which he described as a slow pace.  (*Id.*)  He also observed that Plaintiff performed the test with a "left antalgic gait" and that she "required significant use of the handrails." (*Id.*)  Following the test, Plaintiff's heart rate increased from sixty-five beats per minute to one-hundred and twenty beats per minute, and she reported a pain level of four and a half out of ten.  (*Id.*)

Mr. Misiewicz outlined his findings in a detailed nine-page report.  (*Id.* at PageID.449–57).  In this report, he opined that Plaintiff could perform only sedentary work for no more than five hours and seventeen minutes per day while alternating between sitting and standing.  (*Id.* at PageID.449).  He believed that Plaintiff could not sit for more than two "hours at one time," and he recommended that she "avoid" climbing stairs, "bending forward" to deal cards, or standing at a "craps table."  (*Id.*)  Last, he stated that Plaintiff could frequently perform "fine coordination" and only occasionally perform "firm grasping," pinching, bending, walking, "forward reaching," balancing, sitting, and standing.  (*Id.* at PageID.450).

After Plaintiff applied for benefits, a nonexamining state agency consultant opined that based on Plaintiff's medical record, she displayed "mild" limitations in her ability to "concentrate, persist, or maintain pace."  (*Id.* at PageID.132).  To reach this conclusion, the consultant relied exclusively on a statement from Plaintiff's physician which noted that

Plaintiff "occasionally has problems with depression" because she was not working.  (*Id.*)
However, this physician also found "no signs of mental health or severe affect
disturbance." (*Id.*)  Additionally, Plaintiff told this physician that she was "disabled purely
due to physical problems and that she had "no interest in mental health services." (*Id.*)

### 2.  Plaintiff's Testimony at the Administrative hearing

The ALJ began the hearing by examining Plaintiff.  (*Id.* at PageID.72).  Plaintiff
testified that she lived in a two-story home with her husband and adult daughter.  (*Id.* at
PageID.73).  She testified that while she kept her laundry machine in their basement, she
struggled to descend and ascend the stairs.  (*Id.*)  Indeed, rather than carry loads of laundry
downstairs, Plaintiff stated that she would "throw[]" her laundry "over the rail.  (*Id.* at
PageID.73–74).  She explained that because of issues with her lower back and hips,
walking up and down stairs would cause her pain.  (*Id.* at PageID.75).

She mentioned that she required a cane to remain standing, explaining that although
she had never fallen, her "hips" and "legs" would get "weak."  (*Id.* at PageID.76).  She did
not use any other assistive devices around her home, such as "shower chairs" or "shower
rooms."  (*Id.*)  She required help removing shoes and socks because she had "difficulty"
ending and kneeling.  (*Id.*)  Plaintiff could not drive for extended periods of time without
cramping and burning in her leg.  (*Id.* at PageID.79).

She also struggled to prepare "elaborate" dishes because she could not "stand up"
long enough to cook.  (*Id.* at PageID.83).  Plaintiff performed chores around her house, but
she could only do them "lightly," meaning that she would do her chores in "increments."

(*Id.*)  For example, when Plaintiff vacuumed, she would vacuum for only ten to fifteen minutes before taking a five-to-ten-minute break.  (*Id.* at PageID.84).

Plaintiff also told the ALJ that she had "carpal tunnel" syndrome and "shoulder weakness."  (*Id.* at PageID.74).  Because of these issues, she needed to use both hands to lift a gallon of milk, but even this would cause significant pain in her joints.  (*Id.* at PageID.80).  She could lift neither a twenty-four pack of plastic water bottles, nor her one-year-old grandson.  (*Id.* at PageID.81).  Plaintiff would also drop objects on occasion.  (*Id.* at PageID.82).  Recently, for example, she dropped a dish on the stove while attempting to pour it from a pan.  (*Id.*)  Plaintiff explained that she developed carpal tunnel syndrome while working as a casino dealer, but she had not been treated since 2017.  (*Id.* at PageID.106).  However, although Plaintiff had not recently been treated, she still experienced numbness in her fingers.  (*Id.* at PageID.106–07).

### 3. The Vocational Expert's Testimony at the Administrative Hearing

After Plaintiff testified, the ALJ questioned the vocational expert ("VE").  (*Id.* at PageID.114.)  The ALJ asked the VE to assume a hypothetical person of the same age and educational level as Plaintiff who could perform a full range of light work, except that this person was limited to occasional: crouching; crawling; kneeling; stooping; bending; and climbing ladders, ropes, stairs, or scaffolds.  (*Id.* at PageID.120–21).  The VE replied that the hypothetical person could perform Plaintiff's past work as a casino dealer, "either as performed by [Plaintiff], or" as "generally performed in the national economy."  (*Id.* at PageID.121).  The VE explained, however, that if limited to sedentary work, the

hypothetical claimant could not perform Plaintiff's past work without "some . . . vocational training." (*Id.*)

The ALJ then asked the VE to assume the individual from the prior hypothetical, but to further assume that that individual could not stand or walk for more than four hours during an eight-hour day. (*Id.*) The VE testified that this individual could not perform Plaintiff's past work as a casino dealer. (*Id.* at PageID.121–22). Before the ALJ concluded her examination, the VE clarified that her testimony was generally based on the Dictionary of Occupational Titles, but that her testimony regarding "standing and walking four of eight hours," transferable skills, and direct entry were based on her professional experience. (*Id.* at PageID.122).

## F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2018). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed Psychologist, which includes:

    (i)     A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same

function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

10

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources

11

in the claim, the more persuasive the medical opinion(s) or prior administrative medical

finding(s) will be[.]"  *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]"  *Id.*

§ 404.1520c(c)(3).  This factor will include the analysis of:

    (i)    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

    (ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

    (iii)    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

    (iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

    (v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.*  The fourth factor of the SSA's analysis is "specialization."  In making this

determination, the SSA will consider "[t]he medical opinion or prior administrative

medical finding of a medical source who has received advanced education and training to

become a specialist may be more persuasive about medical issues related to his or her area

of specialty than the medical opinion or prior administrative medical finding of a medical

source who is not a specialist in the relevant area of specialty."  *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other factors

that "tend to support or contradict a medical opinion or prior administrative medical

finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently

14

neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will,

15

however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the

symptoms affect your activities of daily living and your ability to work[.]"   *Id.*
§ 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will
not alone establish that you are disabled. There must be objective medical evidence from
an acceptable medical source that shows you have a medical impairment(s) which could
reasonably be expected to produce the pain or other symptoms alleged and that, when
considered with all of the other evidence (including statements about the intensity and
persistence about your pain or other symptoms which may reasonably be accepted as
consistent with the medical signs and laboratory findings), would lead to a conclusion that
you are disabled."   *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including
pain, we will consider all of the available evidence, including your medical history, the
medical signs and laboratory findings, and statements about how your symptoms affect
you."   *Id.* § 404.1529(a).  The SSA clarified that it will "then determine the extent to which
your alleged functional limitations and restrictions due to pain or other symptoms can
reasonably be accepted as consistent with the medical signs and laboratory findings and
other evidence to decide how your symptoms affect your ability to work."   *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater
severity of impairment than can be shown by objective medical evidence alone, we will
carefully consider any other information you may submit about your symptoms."   *Id.*
§ 404.1529(c)(3).  This other information may include "[t]he information that your medical
sources or nonmedical sources provide about your pain or other symptoms (e.g., what may

precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]"  *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)      [D]aily activities;

    (ii)     The location, duration, frequency, and intensity of . . . pain;

    (iii)    Precipitating and aggravating factors;

    (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)     Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a).  Stated differently, "[i]f you

18

do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1)  The specific medical treatment is contrary to the established teaching and tenets of your religion;
>
> (2)  The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3)  Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;
>
> (4)  The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5)  The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

## G. Arguments and Analysis

### 1.  Mr. Misiewicz's Opinions

Plaintiff first argues that the ALJ erroneously discounted her athletic trainer's opinions on her functional abilities.  Specifically, her athletic trainer, Mr. Misiewicz, completed a form in which he opined that Plaintiff could "perform [only] 54.6% of the physical demands of her job as a dealer."  (ECF No. 10, PageID.449).  To reach this conclusion, Mr. Misiewicz opined that Plaintiff could perform only sedentary work and that she could work for no more than five hours and seventeen minutes per day while

alternating between sitting and standing.  (*Id.*)  He further opined that Plaintiff could not

sit for "at least [two] hours at one time," that she should "avoid" climbing stairs, and that

she should not "bend[] forward" to deal cards or stand at a "craps table."  (*Id.*)  Last, he

stated that Plaintiff could frequently perform "fine coordination" and only occasionally

perform "firm grasping," pinching, bending, walking, "forward reaching," balancing,

sitting, and standing.  (*Id.* at PageID.450).

The ALJ found that Mr. Misiewicz's opinions were "minimally persuasive" and

rejected nearly all of his findings.  (*Id.* at PageID.54–55).  Unlike Mr. Misiewcz, the ALJ

believed that Plaintiff could perform light work for a full eight-hour day without alternating

between sitting and standing.  (*Id.* at PageID.51).  She found that Plaintiff could manipulate

her hands and arms without limitation, and while she agreed that Plaintiff had some

limitations in her legs, she found far fewer limitations, noting that Plaintiff could

occasionally crouch, crawl, kneel, and climb stairs and ladders.  (*Id.*)

An ALJ must consider all medical opinions and explain how persuasive he or she

found the opinions of each medical source.  20 C.F.R. § 404.1520c(a)–(b)(1) (2021).[2]  An

ALJ may not "defer or give any specific evidentiary weight, including controlling weight"

---

[2] Mr. Misiewicz is a medical source.  Under the regulations, a medical source is "an individual who is licensed as a healthcare worker by a State . . . ."  20 C.F.R. § 404.1502 (2021).  And in Michigan, athletic trainers, such as Mr. Misiewicz, are licensed by Michigan's Department of Licensing and Regulatory Affairs.  *Athletic Trainer*, Michigan.gov, https://www.michigan.gov/lara/bureau-list/bpl/health/hp-lic-health-prof/athtrainer (last visited June 8, 2022).  Further, as professionals who "maintain or restore" their clients' "physical . . . well-being," certified athletic trainers provide "healthcare."  *Health care*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/health%20care (last visited June8, 2022); *see Darrylena v. Kijakazi*, No. 20-19984, 2022 WL 1442149, at *11 (D. N.J. May 6, 2022) (holding that physical therapists constitute medical sources); *Baker v. Saul*, No. 20-00095, 2021 WL 2784469, at *3–4, *6 (W.D. Ky. July 2, 2021).

to any medical source—it is the ALJ's responsibility to freely weigh each medical opinion. 20 C.F.R. § 404.1520c(a)–(b)(1).  When considering the persuasiveness of a medical opinion, an ALJ must consider (1) how well the opinion is supported by objective evidence and the medical source's explanations, (2) the opinion's consistency with the entire record, (3) the source's "[r]elationship with the claimant," (4) the specialization of the medical source, and (5) any other factor that may "support or contradict" the medical opinion.  *Id.* § 404.1520c(c).  Opinions on "issues reserved to the commissioner—such as whether a claimant is disabled, whether a claimant can perform light or sedentary work, or whether a claimant can perform his or her past relevant work—are "inherently neither valuable nor persuasive."  *Id.* § 404.1520b(c).

The regulations explain that "supportability" and "consistency" are the most important of these factors.  *Id.* § 404.1520c(b)(2).  Accordingly, an ALJ need only discuss these two factors in his or her decision.  *Id.*  Further, where a medical source opines on multiple functional abilities, the ALJ need not discuss each opinion individually; rather, the ALJ need only discuss the medical source's opinions as a whole, "using the [applicable] factors . . . as appropriate."  *Id.* § 404.1520c(a).  The ALJ's discussion must be detailed enough to allow a reviewing court "to determine whether" the ALJ's decision "was supported by substantial evidence."  *Hardy v. Comm'r of Soc. Sec.*, 20-10918, 2021 WL 3702170, at *4 (E.D. Mich. Aug. 13, 2021) (quotation marks omitted) (quoting *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021)).

Here, the ALJ properly followed the regulations and relied on substantial evidence when discounting most of Mr. Misiewicz's opinions.  To start, Mr. Misiewicz's opinions

that Plaintiff can perform sedentary work and that she can perform only "54.6 %" of the physical demands of her past relevant work concern issues reserved to the commissioner. (ECF No. 10, PageID.449); *see* 20 C.F.R. § 404.1520b(c). Accordingly, the ALJ properly disregarded these statements.

The ALJ also relied on substantial evidence when she discounted Mr. Misiewicz's opinions regarding Plaintiff's postural and ambulatory abilities, such as Plaintiff's ability to bend, walk, or balance. The ALJ reasonably concluded that the significant limitations proposed by Mr. Misiewicz's were inconsistent with other evidence in the record. For example, although Plaintiff displayed "degeneration" and a "disc bulge" in her lumbar spine, her "clinical presentations" were "mostly benign." (ECF No. 10, PageID.54–55). Indeed, Plaintiff generally exhibited "normal gait, coordination, balance, motor and sensory function, range of motion, and strength." (*Id.* at PageID.54–55, 343–45, 347–49, 372–75, 381–85, 547–49, 579–82, 630–33). Moreover, an EMG of Plaintiff's lower back revealed no evidence of peripheral polyneuropathy, lumbosacral radiculopathy, or plexopathy, and an MRI and x-rays revealed only mild degenerative changes in Plaintiff's hips and only moderate degenerative changes in her lumbar spine. (*Id.* at PageID.365–66).

The ALJ also recognized that none of Plaintiff's "treating physicians . . . imposed [any] functional limitations." (*Id.* at PageID.56). For example, Plaintiff's physician once noted that Plaintiff displayed no "objective neurophysiological abnormalit[ies]" in her "lumbar spine" during examination. (*Id.* at PageID.531). Rather, Plaintiff's "subjective symptoms" exceeded any "objective findings" and she "could return to work without restriction." (*Id.*)

22

Moreover, Plaintiff consistently declined treatment.  *See Echols v. Comm'r of Soc. Sec.*, No. 18-12386, 2019 WL 3852528, at *5 (E.D. Mich. July 26, 2019) (recognizing that non-compliance with treatment is a relevant consideration), *report and recommendation adopted by* 2019 WL 3842885 (E.D. Mich. Aug. 15, 2019).  For example, Plaintiff once declined her physician's recommendation that she receive injections to alleviate pain in her hips.  (ECF No. 10, PageID.372– 75).  She also once mentioned to her doctor that she was not taking pain medication, in part because she felt that they did not help, but also because her pain was "of short duration."  (*Id.* at PageID.708).  Shortly after, Plaintiff reported to another physician that she was unwilling "to try medications or procedures" and had been told by other physicians that she had "no medical issues."  (*Id.* at PageID.653).

When Plaintiff did accept treatment, her treatment was conservative, consisting of nothing more than "medication" and "physical therapy."  *Cf. Runk v. Comm'r of Soc. Sec.*, No. 09-12893, 2010 WL 3905241, at *3 (E.D. Mich. Sept. 30, 2010) (referring to "steroid injections" and "physical therapy" as "relatively conservative treatment").  Indeed, Plaintiff's medications consisted of anti-inflammatories and muscle relaxers, rather than "narcotic pain medication," and she took these medications only "as needed."  (ECF No. 10, PageID.56, 86, 343–49, 355, 365, 375, 392–446, 461–514, 656).

Plaintiff also took regular "swim and strength classes," and voluntarily ended physical therapy on two occasions because she felt that her symptoms had improved significantly.  (*Id.* at PageID.56, 104, 392–93, 461–62, 645–46).

And the ALJ did not completely discount Mr. Misiewicz's opinions.  While the ALJ believed that Plaintiff's symptoms were mild, she still recognized that Plaintiff experienced

23

some limitations, and limited her to light work with occasional crouching, crawling, kneeling, stooping, bending, and climbing of stairs or ladders. (*Id.* at PageID.51, 55). This was a reasonable conclusion for the ALJ to draw from the conflicting evidence in the record.

In response, Plaintiff points to various records which might support a more restrictive RFC. (ECF No. 13, PageID.675–76). For example, she mentions that an "Edx study" revealed that she possibly had "lumbar spinal stenosis," and that she once reported "intense pain" to her physician and displayed a limited range of motion at the same examination. (*Id.* at PageID.675). However, while this evidence may provide substantial evidence for a more restrictive RFC, it does not undermine the ALJ's finding. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (stating that courts must uphold the Commissioner's decision "even if substantial evidence also supports the opposite conclusion"). The ALJ weighed this conflicting evidence and reached a reasonable conclusion; the Court may not reweigh the evidence or remand the matter simply because it disagrees with the ALJ's conclusion. *See id.* Accordingly, I suggest that these findings were supported by substantial evidence.[3]

However, I suggest that the ALJ did not rely on substantial evidence when she discounted Mr. Misiewicz's opinions on Plaintiff's ability to use her arms and hands. Plaintiff underwent physical therapy with Mr. Misiewicz for two months to treat her lumbar

---

[3] Plaintiff also argues that the ALJ improperly discounted her subjective complaints regarding her functional abilities involving her back and lower extremities. (ECF No. 13, PageID.680). But for the same reasons that the ALJ relied on substantial evidence in discounting Mr. Misiewicz's opinions, she also relied on substantial evidence in discounting Plaintiff's subjective complaints.

spine and hips.  (*See* ECF No. 10, PageID.458).  Several months after her treatment, Plaintiff returned to Mr. Misiewicz for an evaluation of her functional abilities.  (*Id.* at PageID.449).  Mr. Misiewicz conducted a thorough examination of her arms and hands, testing her range of motion, strength, motor skills, and pain levels.  (*Id.* at PageID.453–57).  These tests consistently indicated that Plaintiff either experienced pain when using her upper extremities, or that she displayed below-average strength.  (*Id.*)  After the examination, Mr. Misiewicz prepared a detailed report discussing his findings, and concluded that Plaintiff had noticeable limitations in her fine motor skills and her abilities to reach, pinch, and grasp.  (*Id.*)  These conclusions were consistent with Plaintiff's testimony at the administrative hearing where she testified that she had difficulty using her hands and arms.  (*Id.* at PageID.74–75).  For example, she mentioned that she required both hands to lift a gallon of milk and would sometimes drop items.  (*Id.* at PageID.80, 82).  Mister Misiewicz's opinions were also consistent with medical notes from other physicians which indicated that Plaintiff experienced issues with her rotator cuff and neck.  (*Id.* at PageID.552, 561, 586, 609, 624, 631).

But the ALJ completely disregarded Mr. Misiewicz's opinions, reasoning that because Mr. Misiewicz's treatment notes did not mention any issues with Plaintiff's upper extremities, there was "no support" for his conclusion that Plaintiff's fine motor coordination, pinching, and forward reaching were impaired.  (*Id.* at PageID.54).

This is an unreasonable conclusion.  There is an obvious explanation for why Mr. Misiewicz's treatment notes did not mention any issues with Plaintiff's upper extremities— Plaintiff hired him to treat her hips and lower back, not her arms and hands.  (ECF No. 10,

PageID.458, 513).   One could not reasonably expect Mr. Misiewicz's notes to have mentioned a medical issue that was completely unrelated to Plaintiff's treatment, particularly when Plaintiff's treatment lasted for only two months.  (*Id.* at PageID.54, 458–513).  And, contrary to the ALJ's assertion that there was "no support" for Mr. Misiewicz's opinions, his examination notes provided a thorough rationale for his conclusions.  (*Id.* at PageID.449–57).

To be sure, an ALJ may consider whether a medical source's opinion is supported by findings in his or her treatment notes.  But generally, this is only a notable factor where one would expect the treatment notes to contain findings which are relevant to the medical source's opinions.  For example, in *Marilyn S. v. Comm'r of Soc. Sec.*, a claimant's physician opined that the claimant's use of her legs was significantly limited, in part because the claimant had an edema and "severe pain" in her hips and feet.  No. 21-3598, 2022 WL 472440, at *9 (S.D. Ohio Feb. 16, 2022).  However, the in the physician's treatment notes, [she/he] indicated that the claimant did not have an edema, that the claimant rated her pain at a "0/10," and that "imaging findings" of the claimant's feet were "mild."  *Id.*  Because the treatment notes addressed the issues raised in the physician's opinion, and still provided little to no support, the ALJ relied on substantial evidence in discounting the physician's opinions.  *Id.*; *cf. McMillen v. Comm'r of Soc. Sec.*, No. 20-cv-2531, 2022 WL 1215495, at *11–13 (N.D. Ohio Mar. 11, 2022); *Murray v. Comm'r of Soc. Sec.*, No. 21-cv-2078, 2021 WL 6063289, at *3–5 (S.D. Ohio Dec. 22, 2021).

Unlike the physician in *Marilyn S.*, Mr. Misiewicz's treatment notes do not contradict his opinion.  His notes are not inconsistent with his opinion, and their silence on

26

Plaintiff's upper extremities is explained by the fact that he was hired only to treat Plaintiff's lower back. *Cf. Marilyn S.*, 2022 WL 472440, at *9. While his opinions may have been stronger if they were corroborated by his notes, his notes also do not undermine his conclusions.[4]

The ALJ provides only two other reasons for discounting these opinions—both of which are unconvincing. First, she mentions that Plaintiff likely requested the evaluation to support her disability application. (ECF No. 10, at PageID.54). But even if this is true, it is not a valid reason to discount Mr. Misiewicz's opinions. *Punzio v. Astrue*, 630 F.3d 704, 712–13 (7th Cir. 2011); *see Blankenship v. Bowen*, 874 F.2d 1116, 1122 n.8 (6th Cir. 1989). Second, the ALJ mentions that Mr. Misiewicz had a relatively short treating relationship with Plaintiff. (ECF No. 10, PageID.54). While this is a legitimate factor for the ALJ to consider, it provides little guidance here because Mr. Misiewicz drew support for his opinions from his examination of Plaintiff, rather than his treatment, and the ALJ does not cite a source, with a more extensive treatment history, who contradicts Mr. Misiewicz's opinions. *See* 20 C.F.R. § 404.1520c(c)(3)(i). Although Mr. Misiewicz's opinions may have been stronger if he had an extensive treatment history, the lack of an extensive relationship with Plaintiff, standing alone, is not a logical reason to disregard his opinions.

---

[4] Although a claimant's failure to seek adequate treatment is a relevant factor for an ALJ to consider when evaluating the severity of a claimant's impairment, this factor could not have reasonably justified the ALJ's rejection of Mr. Misiewicz's opinions. *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 & n.1 (6th Cir. 2016). Indeed, not only were Plaintiff's symptoms relatively mild, but she had mentioned difficulties with her upper extremities to other health care providers. (*See, e.g.*, ECF No. 10, PageID.359, 552, 561, 586, 609, 624, 631).

For these reasons, I suggest that the ALJ did not rely on substantial evidence when she disregarded Mr. Misiewicz's opinions on Plaintiff's fine motor coordination, pinching, grasping, and forward reaching.  Accordingly, I suggest that the Court should remand this matter to the ALJ so that she can formulate an RFC that adequately accounts for Mr. Misiewicz's opinions.

### 2.    Mental Impairments

At the initial level of Plaintiff's disability application, the SSA found that Plaintiff was not disabled, and it issued a "Disability Determination Explanation" ("DDE") in which the Administration discussed its rationale.  (ECF No. 10, PageID.127–37).  In the DDE, a state agency consultant opined at step two that Plaintiff experienced "mild" limitations in her ability to "concentrate, persist, or maintain pace" because of her depression.  (*Id.* at PageID.132).  Although the ALJ did not discuss this specific opinion, she found that the DDE, as a whole, was "persuasive" because its ultimate conclusion that Plaintiff could perform her prior work as a casino dealer was supported by the medical evidence in the record.  (*Id.* at PageID.55).

Plaintiff argues that because "even a mild limitation" in concentration, persistence, or pace can result in mental functional limitations, the ALJ, at a minimum, should have explained why she found no mental functional limitations despite tacitly adopting the state agency consultant's opinion that Plaintiff had mild limitations in concentration, persistence, or pace.  (ECF No. 13, PageID.676–77).  In response, the Commissioner argues that the ALJ's RFC finding is supported by substantial evidence, and the Commissioner cites a myriad of evidence to support the conclusion that Plaintiff's mild

difficulties in concentration did not translate to any functional limitations. (ECF No. 15, PageID.702–05).

But the Commissioner misunderstands Plaintiff's argument. Plaintiff does not argue that the ALJ's RFC finding (insofar as it concerns her mental abilities) is not supported by substantial evidence. Rather, she argues that the ALJ erred by failing to consider or discuss the effect of her mild limitations in concentration, persistence, and pace on her functional abilities. (*See* ECF No. 13, PageID.680 explaining that the ALJ erred because she failed to "consider" the impact of her mild limitations on her functional abilities); *see also* ECF No. 16, PageID.720). Had the ALJ done so, Plaintiff argues, then she may have found that Plaintiff experienced some mental functional limitations. (ECF No. 13, PageID.680). As Plaintiff correctly notes, most courts hold that where an ALJ finds even mild limitations in concentration at step two, the ALJ must either incorporate this finding into his or her RFC or explain why these mild deficits do not translate into functional limitations. *See, e.g.*, *McIntyre v. Colvin*, 758 F.3d 146, 151–52 (2d Cir. 2014); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180–81 (11th Cir. 2011) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 288 (6th Cir. 2009)); *Lawrence J. v. Saul*, No. 19-1834, 2020 WL 108428, at *3 (N.D. Ill. Jan. 9, 2020).

Even properly stated, however, Plaintiff's argument still fails. The record contains no evidence from which the ALJ could have found, like the state consultant, that Plaintiff's depression was a medically determinable impairment which caused mild limitations in her ability to concentrate. Thus, it appears that the ALJ did not adopt the consultant's opinion, and accordingly, the ALJ did not err by failing to consider the effect of Plaintiff's mild

limitations in concentration on her RFC.  Moreover, even if the ALJ mistakenly adopted the consultant's opinion, any error resulting from this choice would be harmless because, on remand, the ALJ would be expected to follow the Commissioner's regulations and find that Plaintiff had no medically determinable mental impairments.

At step two, an ALJ must consider whether the claimant has any severe, medically determinable impairments.  20 C.F.R. § 404.1520(a)(4)(iii) (2021).  If the claimant has at least one severe medically determinable impairment, the ALJ proceeds through the sequential evaluation process, considering all the claimant's medically determinable impairments—both severe and nonsevere.  *Id.* §§ 404.1545(a)(2).  The ALJ need not, however, consider any impairments that are not medically determinable.  *See id.*

The regulations also provide a "special technique" which ALJs must follow to evaluate mental impairments in adults.  *Id.* § 404.1520a(a), (e).  This technique requires the ALJ to begin by determining whether a claimant has a medically determinable mental impairment.  *Id.* § 404.1520a(b)(1).  If, and only if, the ALJ finds a medically determinable mental impairment, the ALJ must then rate the claimant's abilities in four functional areas—including the claimant's ability to "concentrate, persist, or maintain pace"—on "the following five-point scale: none, mild, moderate, marked, and extreme."  *Id.* § 404.1520a(b)–(c).  From here, the ALJ must determine whether the mental impairment is severe and proceed through the five-step process accordingly.  *Id.* § 404.1520a(d).

Thus, the regulations only require ALJs to consider mental impairments which are medically determinable when evaluating a claimant's RFC.  *See Rouse v. Comm'r of Soc. Sec.*, No. 16-0223, 2017 WL 163384, at *4 (S.D. Ohio Jan. 17, 2017).  Likewise, to find

that a mental impairment has an impact on a claimant's ability to "concentrate, persist, or maintain pace," the ALJ must first find that the mental impairment is medically determinable. *See* 20 C.F.R. § 404.1520a(b)(1).

A medically determinable impairment is one that "result[s] from anatomical, physiological, or psychological abnormalities" and "can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. Accordingly, to be considered "medically determinable," an impairment "must be established by objective medical evidence from an acceptable medical source." *Id.* Objective evidence refers to medical "signs" or "laboratory findings"—an ALJ may not use diagnoses, medical opinions, or a claimant's self-reported symptoms "to establish the existence of" a medically determinable impairment. *Id.* §§ 404.1502(f), 404.1521.

For example, in *Sesberry v. Astrue*, the Middle District of Florida held that a claimant could not establish that his depression was a medically determinable impairment because the only evidence of his depression consisted of self-reported symptoms and treatment. No. 08-989, 2010 WL 653890, at *4 (M.D. Fla. Feb. 18, 2018). The record mentioned his depression only twice: once, when Plaintiff told the consultative examiner that he had "a past medical history of . . . depression, and again, when he told his physician that he "had trouble sleeping due to '[h]is emotional state' and [that] at times he feels depressed . . . .'" *Id.* at *3. Based only on the claimant's self-reported symptoms, the claimant's physician opined that he had an "adjustment disorder," prescribed him an antidepressant, and referred him for a psychological evaluation—the results of which were not included in the record. *Id.* The court reasoned that the ALJ could not rely on the

31

claimant's self-reported symptoms to find that the claimant's depression was medically determinable. *Id.* at *4. And, because the physician based his evaluation "solely on [the claimant's own statement of symptoms," it could "not constitute laboratory findings or medically acceptable diagnostic techniques . . . ." *Id.*

Similarly, here, the record contains no objective evidence from which the ALJ could have found that Plaintiff's depression was a medically determinable impairment. True, the consultative examiner diagnosed Plaintiff with "adjustment disorder with anxiety and depression," but as in *Sesberry*, this diagnosis was based entirely on self-reported symptoms. (ECF No. 10, PageID.388). Indeed, all of the examiner's objective observations were normal and his diagnosis entirely on a "medical source statement" in which one of plaintiff's physician's noted that Plaintiff reported that Plaintiff occasional agitation and "occasional[] . . . problems with depression." (*Id.* at PageID.386–88). But even this medical source noted that Plaintiff displayed "no signs of mental health or severe affect disturbance." (*Id.* at PageID.388). And these findings are consistent with other treatment notes in the record which consistently indicate that Plaintiff displayed no signs or symptoms of depression or anxiety. (*E.g.*, *id.* at PageID.374, 383, 387–88, 537, 580, 654). The only evidence in the record which indicate any mental impairments consist of diagnoses and self-reported symptoms, but standing alone, these are insufficient to find a medically determinable impairment. *See Sesberry*, 2010 WL 653890, at *4.

Yet this conclusion only takes the Court so far. If the ALJ found that Plaintiff's depression was medically determinable, regardless of whether this finding was correct, then she was required to articulate her findings under special technique provided by 20

C.F.R. § 404.1520a and to consider the impact of Plaintiff's depression on her RFC.  *See* 20 C.F.R. § 404.1520a(b)(1) (requiring ALJs to utilize the special technique for any impairment they "determine" are medically determinable).  And, arguably, the ALJ failed on both counts.

It is not clear whether the ALJ adopted the consultant's opinion that Plaintiff's depression was medically determinable.  While the ALJ found the DDE's conclusion to be persuasive, she did not explicitly comment on the consultant's opinion that Plaintiff's depression was medically determinable and caused mild limitations in concentration. (ECF No. 10, PageID.55).  And to complicate matters further, at step two, the ALJ found that three of Plaintiff's impairments, including her depression, were either nonsevere or not medically determinable, but she did not clarify which impairments were not medically determinable and which impairments were nonsevere.  (*Id.* at PageID.50–51).

Nonetheless, the Court can infer from the ALJ's step two discussion that she found Plaintiff's depression not to be medically determinable.  At step two, the ALJ wrote that Plaintiff "consistently exhibited normal mental status examinations" and never "received formal mental health treatment."  (*Id.* at PageID.50).  She also mentioned the consultative examiner reported a "a completely unremarkable mental status examination" of Plaintiff and that Plaintiff displayed "no signs of mental health or severe affect disturbance" at this examination.  (*Id.*)  The ALJ's discussion seems to be focused on the lack of signs or symptoms in the record, rather than the impact of Plaintiff's depression on her ability to perform basic work activities.  *See* 20 C.F.R. § 404.1521.  For that reason, the Court should infer that the ALJ found that Plaintiff's depression was not medically determinable, rather

than nonsevere, and that the ALJ therefore made no finding on Plaintiff's ability to concentrate, persist, or maintain pace.  Accordingly, I suggest that the ALJ could not have erred by failing to consider the impact of Plaintiff's concentration on her RFC.  *Cf. Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 5118598, at *8 (E.D. Mich. Aug. 21, 2018); *Sesberry*, 2010 WL 653890, at *4.

But even if the ALJ found, incorrectly, that Plaintiff's depression was medically determinable, and therefore erred either by failing to follow the special technique, or by failing to discuss the effect of Plaintiff's mild limitations on her RFC, these errors would be harmless.  Courts will not remand a matter to an agency unless "the claimant has been prejudiced on the merits or deprived of substantial rights . . . ."  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) (internal marks omitted) (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)).  In other words, the court will not remand if "the administrative agency would have made the same ultimate [conclusion] with the erroneous finding removed from the picture . . . ."  *Berryhill v. Shalala*, No. 92-5876, 1993 WL 361792, at *7, (6th Cir. Sept. 16, 1993) (quotation marks omitted) (quoting *Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976)).

Here, assuming that the ALJ erroneously adopted the consultant's opinions, the errors which were prejudicial to Plaintiff stem from this favorable mistake.  Thus, if the Court remanded this matter to the SSA to correct the prejudicial errors, the ALJ would first be required to correct her mistaken finding that Plaintiff's depression was medically determinable, and would therefore have no need to address these errors.  Indeed, "[i]t is an elemental principle of administrative law that agencies are bound to follow their own

regulations." *Rabbers*, 582 F.3d at 654 (internal quotation marks omitted) (first quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004)).  The Court cannot remand in the hopes that the ALJ will give Plaintiff another free pass; it must presume that the ALJ will follow the regulations and find that Plaintiff's depression was not medically determinable.  *See id.*  This finding would render the issues concerning Plaintiff's depression and concentration moot and make the remand process, as it relates to this issue, nothing more than an "'idle and useless formality.'"  *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (quoting *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)).

### 3.   Sentence Six

Last, Plaintiff argues that the Court should remand this matter to the SSA so that the ALJ can consider an independent medical examination report which was not included in the record.  Sentence six of 42 U.S.C. § 405(g) (2018) allows the Court to remand a matter to the SSA so that the Commissioner may consider "additional evidence" which was not part of the record when the Administration made its final decision.  A sentence six remand is only appropriate where (1) the claimant presents new and material evidence, and (2) the claimant demonstrates "good cause" for failing to present the evidence to the ALJ.  *Willis v. Sec'y of Health and Hum. Servs.*, 727 F.2d 551, 553 (6th Cir. 1984).

Here, the report which Plaintiff seeks to introduce is "new" evidence.  Evidence is new if it was "not in existence or available to the claimant at the time of the administrative hearing."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Although the report predates Plaintiff's hearing, the report was not available to her.  (ECF No. 10, PageID.312).  Indeed,

her counsel made several attempts to obtain the report between July 2019 and February 2020, but the examiner did not send him the report until after the ALJ rendered her decision. (*Id.* at PageID.44, 304–06, 309).

However, although the report is "new," it is not material, and Plaintiff has not shown good cause for failing to present the report to the ALJ.  Evidence is material if it is both relevant and probative and there "is a reasonable opportunity that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Hum. Servs.*, 865 F.2d 709, 711.  Evidence which is "cumulative of" other evidence or opinions "already present in the record" is not material. *Young v. Sec'y of Health & Hum. Servs.*, 925 F.2d 146, 149 (6th Cir. 1990); *see also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 598 (6th Cir.2005).  Indeed, if the new evidence simply "reflects the same evidence and opinions" that were available to the ALJ, "then it is not probable that the 'new' evidence would have changed the outcome." *Walton v. Astrue*, 773 F. Supp. 2d 742, 751 (N.D. Ohio 2011) (quoting *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 654 (6th Cir. 2009)).

New opinion evidence is cumulative if it relies exclusively on information which is already in the record.  For example, in *Evangelista v. Sec'y of Health & Hum. Servs.*, a claimant moved for a sentence six remand so that she could present a favorable medical opinion from her physician to the ALJ.  826 F.3d 136, 139 (1st Cir. 1987).  Although her physician opined that the claimant had a more restrictive RFC than the ALJ had assessed, the physician based his opinions on a review of the evidence already in the record, as well

36

as his own physical examination of the claimant, in which he made no unique findings. *Id.* The First Circuit held that the physician's opinions were not material because they were not based on new medical "facts." *Id.* at 140 (emphasis removed).  Although the medical source offered a unique interpretation of the underlying facts, he contributed nothing new to the already "voluminous" and "detailed" medical record, and the mere fact that the medical source "happened to disagree with the conclusion reached by the ALJ" did "not render the evidence which form[ed] the basis for his opinion any less cumulative . . . ." *Id.* Holding otherwise, the First Circuit feared, would allow claimants to circumvent the "newness" requirement of §405(g) by simply retaining an expert to "reappraise" the evidence. *Id.* ("[I]n a sophisticated, enterprising world where there are often almost as many opinions as there are experts.").

Much like in *Evangelista*, Plaintiff seeks to introduce medical opinions which rely entirely on information that was available to the ALJ.  Indeed, Dr. Arbit, the author of this report, explains that based his opinions primarily on Plaintiff's medical records.  (ECF No. 10, PageID.313).  And while he conducted a physical examination of Plaintiff, he found no materially unique findings which would affect the ALJ's decision.  (*See id.* at PageID.319–21).  Because Dr. Arbit's report presents no new objective evidence, it would not change the ALJ's rationale—she would almost certainly reject his opinions for the same reasons that she rejected other favorable opinions in the record. *See Walton*, 773 F. Supp. 2d at 751; *cf. Evangelista*, 826 F.3d at 140.  Accordingly, because this report presents cumulative

evidence, I suggest that it is not material, and it therefore does not warrant a sentence six remand.

And even if the Court found that the report was material, Plaintiff has not shown good cause for failing to present the report to the ALJ. To show good cause, a claimant must present a "reasonable justification for failing to 'acquire and present the evidence for inclusion in the hearing to the ALJ.'" *Helton v. Comm'r of Soc. Sec.*, No. 13-427, 2014 WL 4908589, at *7 (S.D. Ohio July 10, 2014) (quoting *Foster*, 279 F.3d at 357), *report & recommendation adopted by* 2014 WL 4908586 (S.D. Ohio Sept. 30, 2014).

A claimant must generally present all evidence to the ALJ "no later than [five] business days" prior to the hearing. 20 C.F.R. § 404.935(a) (2021). If the claimant fails to meet this deadline, then the ALJ may "decline to consider" the tardy evidence. *Id.* This decision, however, is within the ALJ's discretion, and the ALJ may choose to consider evidence submitted later than five days prior to the hearing. *See id.* Moreover, if the claimant shows that he or she "actively and diligently sought evidence from a source," but could obtain the evidence by the deadline, then the ALJ must hold open the administrative record to allow the claimant to submit the evidence. *Id.* § 404.935(b)(iv).

The regulations also allow ALJ's to subpoena medical records from third parties. This power may be exercised on the ALJ's own initiative, or on request of the claimant. *Id.* § 404.950(d). If a claimant wishes to subpoena documents, then he or she must "file a written request . . . at least [ten] business days before the hearing date." *Id.* § 404.950(d)(2).

But this deadline as well may be excused where the claimant makes diligent, but unsuccessful, efforts to obtain the desired evidence. *Id.* §§ 404.950(d)(2), 404.935(b)(iv).

A claimant who does not take full advantage of these provisions generally cannot show good cause for failing to present medical evidence to the ALJ. In *Bass v. McMahon*, for example, the Sixth Circuit explained that a plaintiff who did not ask the ALJ to hold the record open to allow her to submit a medical record could not later establish good cause for failing to submit the evidence. 499 F.3d 506, 513 (6th Cir. 2007) (citing *Curry v. Sec'y of Health & Hum. Servs.*, No. 87–1779, 1988 WL 89340, at *4 (6th Cir. Aug. 29, 1988)).

Similarly, here, Plaintiff allowed the ALJ to close the record without taking full advantage of the regulations to develop a complete record. Indeed, while Plaintiff initially requested that the ALJ hold the record open to allow her to obtain Dr. Arbit's opinions, she later told the ALJ that she could close the record before she received the report. (ECF No. 10, PageID.304–05). And while Plaintiff eventually asked the Commissioner to issue a subpoena, she did not make this request until after the ALJ issued her decision. (*Id.* at PageID.306). Because Plaintiff apparently gave up on pursuing this record while she was before the ALJ, she cannot now establish good cause for a sentence six remand. *Cf. Bass*, 499 F.3d at 513. Accordingly, I suggest that even if this record was material, the Court still should not remand the matter under sentence six.

### H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **GRANTING** Plaintiff's Motion, (ECF No. 13), **DENYING**

the Commissioner's Motion (ECF No. 15), and remanding the case under sentence four of Section 405(g).

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 15, 2022                    S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge